UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **KATHLEEN M. KELLER and CRYSTAL SMITH, individually and on behalf of others similarly situated,** | Court File No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| **NORTH MEMORIAL HEALTH CARE, THE BOARD OF DIRECTORS OF NORTH MEMORIAL HEALTH CARE, and JOHN DOES 1–25,** | |
| Defendants. | |

Plaintiffs Kathleen M. Keller and Crystal Smith ("Plaintiffs"), by and through their attorneys, on behalf of the North Memorial Health 401(k) Plan (the "Plan")[1], themselves, and all others similarly situated, states and alleges as follows:

1.     This is a putative class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include North Memorial Health Care ("North Memorial" or "Company") and the Board of Directors of North Memorial Health Care and its members during the Class Period ("Board") for breaches of their fiduciary duties.

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

2.      ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries to further the public policy of safeguarding Plan assets and protecting participants' retirement investments. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These dual fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

3.      The United States Department of Labor mandates that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See* U.S. Dep't of Labor: Emp. Benefits Sec. Admin., *A Look at 401(k) Plan Fees* 2 (Sept. 2019), available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited May 11, 2022) ("You should know that your employer also must consider the fees and expenses paid by your plan."); *see also Tibble v. Edison Int'l* (*Tibble I*), 575 U.S. 523, 530 (2015) (affirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must consider the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are

obligated to minimize costs." Unif. Prudent Inv'r Act § 7 cmt. (Unif. Law Comm'n 1994) [hereinafter "UPIA"] (incorporating *Forward* to Restatement (Third) of Trusts: Prudent Investor Rule (1992)). "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l* (*Tibble II*), 843 F.3d 1187, 1197–98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts § 90, cmt. b).

5.      Additional fees of fractions of a percent can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

6.      The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022).

7.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their retirement plans, as well as

investigating alternatives in the marketplace to ensure that well-performing, low-cost investment options are being made available to plan participants.

8.      North Memorial sponsors one plan that is subject to ERISA's fiduciary duties.

9.      The 401(k) Plan is a defined contribution plan, effective January 1, 1999, and amended and restated throughout the years. All eligible employees of North Memorial may enter the Plan on the first day of the month following the date on which the employee has completed 30 days of service. The Plan was amended after its establishment to allow certain union employees to participate. At all times during the Class Period, the 401(k) Plan had at least $286 million dollars in assets under management. At the Plan's fiscal year end in 2020, the 401(k) Plan had over $465 million in net assets under management that were or are entrusted to the care of the Plan's fiduciaries.

10.     As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that, during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, inter alia, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was

4

prudent, in terms of cost; (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping costs.

12.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.      Based on this conduct, Plaintiff assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence.

## PARTIES

### I.      Plaintiffs

14.      Plaintiff, Kathleen M. Keller ("Keller"), resides in Circle Pines, Minnesota. During her employment, Plaintiff Keller participated in the 401(k) Plan, investing in the options offered by the Plan which is the subject of this lawsuit.

15.      Plaintiff, Crystal Smith ("Smith"), resides in Bloomington, Minnesota. During her employment, Plaintiff Smith participated in the 401(k) Plan, investing in the options offered by the Plain which is the subject of this lawsuit.

16.      Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and

what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

17.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

## II.     Defendants

### A.     Employer Defendant

18.     North Memorial is the sponsor and a named fiduciary of the Plan with a principal place of business being 3300 Oakdale Avenue North, Robbinsdale, Minnesota 55422. *See* North Memorial Health Care 401(k) Plan, Annual Return/Report of Employee Benefit Plan ("2020 Form 5500") at 1.

19.     North Memorial determines the appropriateness of the Plan's investment offerings and monitors investment performance. North Memorial fell well short of these fiduciary standards.

20.     Accordingly, during the putative Class Period, North Memorial is and was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C.

§ 1002(21)(A) because it exercised discretionary authority over management or disposition of Plan.

21.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**B.     Board Defendants**

22.     North Memorial, acting through its Board of Directors, determines the appropriateness of the Plan's investment offerings and monitors investment performance. As will be discussed below, the Board fell well short of these fiduciary standards.

23.     The Board during the putative Class Period is and was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because, upon information and belief, it exercised discretionary authority over management or disposition of Plan assets.

24.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1–25) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

25.     The Board and the unnamed members of the Board during the Class Period, are collectively referred to herein as the "Board Defendants."

**C.      Additional John Doe Defendants**

26.      To the extent that there are additional officers, employees and/or contractors of North Memorial who are/were fiduciaries of the Plan during the Class Period or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1–40 include, but are not limited to, North Memorial officers, employees, and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

**JURISDICTION & VENUE**

27.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

28.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

29.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a

substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

**FACTS**

### III.      The Plan

30.     North Memorial established the Plan to provide retirement income benefits to its employees and to provide such Employees with an opportunity to accumulate retirement savings on a tax deferred basis. The Plan has been hindered in fulfilling its purpose by the fiduciary breaches of both North Memorial and the Board.

31.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

32.     In general, all eligible employees are able to participate in the Plan on the first day of the month following the date on which the employee has completed 30 days of service. *See* North Memorial Health Care, Annual Returns/Reports of Employee Benefit Plan (Form 5500) supp. at 5 (Sept. 29, 2021) [hereinafter the "2020 401(k) Auditor Report"]. The 2020 401(k) Auditor Report provides that the Plan is a defined contribution plan sponsored by North Memorial, covering substantially all employees of the Company and participating employers.

33.     There are several types of contributions that could be added to a participant's 401(k) account including: a pre-tax employee salary deferral contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions based on contributions.  With regard to employee contributions, eligible participants are permitted to elect to have a percentage of their compensation contributed as pre-tax 401(k) contributions or Roth deferral contributions to the Plan. Eligible new employees who fail to make a deferral election will be automatically enrolled to have their compensation reduced by 6% as a pre-tax contribution. Participants are allowed to change the automatic enrollment and elect a different percentage. Participants who have attained age 50 before the end of the Plan year are eligible to make catch-up contributions. *Id.*

34.     North Memorial made and will make a matching contribution to all eligible participants. The employer matching contribution is equal to 100% of the participant's contribution, limited to the first 3% of compensation deferred and 50% of the participant's contribution from 3% to 5% of compensation deferred. *Id.*

35.     Like other companies that sponsor 401(k) plans for their employees, North Memorial enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally 401(k) Plan Overview*, I.R.S., https:/www.irs.gov/retirement- plans/plan-sponsor/401k-plan-overview (last updated Nov. 15, 2021).

36.     North Memorial also benefits in other ways from the Plan's matching program. It is well- known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See Employer Benefits of 401(k) Plans*, PAYCHEX (July 6, 2021), https://www.paychex.com/articles/employee-benefits/employer- matching-401k-benefits.

37.     Given the size of the Plan, North Memorial likely enjoyed a significant tax and cost savings from offering a match.

38.     In theory, North Memorial determines the appropriateness of the Plan's investment offerings and monitors investment performance. North Memorial and the Board fell well short of their fiduciary obligations in this regard.

39.     Several funds were available to Plan participants for investment each year during the putative Class Period. Specifically, a participant must direct all contributions to selected investments as made available and determined by North Memorial or the Board.

40.     During the Class Period, administrative expenses were paid using the Plan's assets. As described in the Auditor Report: "Administrative expenses of the Plan are paid by the Plan, as provided in the Plan document. Participants pay administrative costs for loans distributions and qualified domestic relation orders. All investment management and transaction fees directly related to the Plan investments are paid by the participants and charged against the Plan's earnings." 2020 401(k) Auditor Report at 6.

41.     Transamerica Corporation ("Transamerica") was the recordkeeper for the Plan for five of the six years of the Class Period.

11

42.     The SEC has, on several occasions, imposed remedial sanctions and cease-and-desist orders on Transamerica for its conduct that violated federal law.

43.     According to the SEC, Transamerica made material misstatements of fact to investors and potential investors, engaged in business practices which operated as a fraud or deceit upon clients or prospective clients, failed to reasonably supervise the variable annuity recommendations its agents were making, and failed to reasonably supervise the 529 plan share-class recommendations that its agents were making, among other violations. *See* Transamerica Asset Management, Inc., Investment Advisers Act Release No. 5599 (Sept. 30, 2020); Transamerica Asset Management, Inc., Investment Company Act Release No. 34035 (September 30, 2020); Transamerica Financial Advisors, Inc., Investment Advisors Act Release No. 5150 (March 11, 2019); Transamerica Financial Advisors Inc., Securities Exchange Act No. 71850 (April 3, 2014); Transamerica Financial Advisors, Inc., Investment Advisers Act Release No. 3808 (April 3, 2014).

## IV. The Plan's Fees Were Unreasonable

### A.     The Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner.

44.      As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

45.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to

select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 575 U.S. at 529.

46.     Plaintiffs did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.") For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon the numerous factors set forth below.

47.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in *inter alia*, the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

48.      Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (conservatively, plans having between 250 million dollars and 500 million dollars in assets).

49.     In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[10]

50.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether to enter or extend such contract or arrangement.

51.     As stated by the DOL, ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." *Fact Sheet: Final Regulation Relating to Service Provider Disclosures Under Section 408(b)(2)*, Dep't of Labor: Empl. Benefits Sec. Admin. at 1 (Feb. 2012) [hereinafter "DOL 408(b)(2) Regulation Fact Sheet"], https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf.

**B.**     **Several of the Plan's Funds Were Not in the Lowest Fee Share Class Available to the Plan.**

52.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

53.     A prudent fiduciary would immediately know to use the lowest cost available share class in a plan.

54.     Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets. Qualifying for lower share classes usually requires only a minimum of one million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan.  *See, e.g., Davis et al. v. Washington Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

55.     Simply put, a fiduciary to a large defined contribution plan such as the Plan can use their asset size and negotiating power to invest in the cheapest share class available.

56.     The total assets under management for all of these funds was over 460 million dollars, thus easily qualifying them for lower share classes.  For illustration, the

following chart provides detail some of the funds with lower share classes available to the fund:

| Fund in the Plan | Plan Share Class | Expense Ratio | Less Expensive Share Class | Lower Expense Ratio | Excess Cost |
|---|---|---|---|---|---|
| Goldman Sachs Small Cap Value | GSSIX | 0.99 | GSYPX | 0.95 | 0.04 |
| J. Hancock Disciplined Value Mid Cap | JVMIX | 0.87 | JVMRX | 0.75 | 0.12 |
| Loomis Sayle Small Cap Growth | LSSIX | 0.92 | LSSNX | 0.82 | 0.1 |
| American Funds Europacific Growth | RERHX | 0.62 | RERGX | 0.46 | 0.16 |
| Amg Timessquare Mid Cap Growth | TMDPX | 1.18 | TMDIX | 0.98 | 0.2 |
| Western Asset Core Plus Bond | WACPX | 0.52 | WAPSX | 0.42 | 0.1 |
| T. Rowe Price International Discovery | PRIDX | 1.18 | TIDDX | 1.06 | 0.12 |

57.     At all times during the Class Period, Defendants knew or should have known of the existence of identical less expensive share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

58.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds could not have (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.  In short, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the

only consequence was higher costs and lower year-over-year returns for Plan participants.

59.     Indeed, "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved … in this case would mandate a prudent fiduciary—who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs—to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at *13 (C.D. Cal. Aug. 16, 2017).

60.     Here, had the Plan's fiduciaries prudently undertaken their fiduciary responsibility for determining the appropriateness of the Plan's investment offerings and monitoring investment performance, the Plan would have moved to the identical lower cost share class of the identical fund.

61.     In fact, had the Plan's fiduciaries undertaken their fiduciary responsibility, they would have learned that the Securities and Exchange Commission filed charges against JP Morgan Securities LLC—the provider of the Plan's target date funds—alleging that it failed to provide certain customers with sales charge waivers and lower fee share classes when selling certain mutual funds to them. *See* J.P. Morgan Secs. LLC, Securities Act Release No. 10741, Exchange Act Release No. 87919, Investment Advisers Act Release No. 5429, 2020 WL 108470 (Jan. 9, 2020); *see also SEC Charges J.P. Morgan Securities for Disclosure Failures Related to Retirement and Charitable*

*Customers*, U.S. Secs. & Exchange Comm'n (Jan. 9, 2020),

https://www.sec.gov/enforce/33-10741-s. Despite the public nature of the charges, the

SEC Order finding JPMS violated the Securities Act of 1933, and subsequent

settlement, Defendants failed to move the Plan's assets to the identical lower cost share

classes.

### C.     Many of the Plan's Funds Charged Excessive Management Fees.

62.     Investment options have a fee for investment management and other

services.  Like any other investor, retirement plan participants pay for these costs via the

fund's expense ratio stated as a percentage of assets invested in the fund.  For example,

an expense ratio of 0.75% means that the plan participant will pay $7.50 in management

fees annually for every $1,000 in assets.

63.     The expense ratio reduces the participant's return and the compounding

effect of that return because it is paid out of the assets invested in the plan. Expense

ratios in retirement accounts are particularly undesirable because the fees are paid using

tax advantaged money.  Therefore, it is prudent for a plan fiduciary to consider the effect

that expense ratios have on investment returns because it is in the best interest of

participants to do so.

64.     For purposes of evaluating expense ratios of an investment, plan

fiduciaries should obtain competitive pricing information (*i.e.*, fees charged by other

comparable investment funds to similarly situated plans).  This type of information can

be obtained through mutual fund data services, such as Morningstar, or with the assistance of the plan's expert consultant.

65.     F or comparator information to be relevant for fiduciary purposes, it must be consistent with the size of the plan and its relative bargaining power.  Large plans, for instance, are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

66.     Here, the Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

**D.     Several of the Funds in the Plan had Lower Cost Better Performing Alternatives in the Same Investment Style.**

67.     The Plan failed to replace several of the higher cost and underperforming funds which in 2020 housed over 460 million dollars in participant assets. These funds had nearly identical lower cost alternatives during the Class Period. These funds are what's known as actively managed funds. An actively managed investment fund is a fund in which a manager or a management team makes decisions about how to invest the fund's money. Thus, the success or failure of an actively managed fund is linked directly to the abilities of the managers involved, this an additional risk factor called management risk.

68.     Here, the performance of the managers of these funds fell well short of acceptable industry standards and they should have been replaced at the beginning of the Class Period or sooner. Failure to do so cost the Plan and its participants millions of dollars in lost opportunity and revenue.

69.     There were, at least, hundreds of superior performing less expensive alternatives available during the Class Period one of which should have been selected by the Plan.

70.     The chart below choses one of these superior performing alternatives out of the many available for each fund and compares them to some of the underperforming funds currently in the Plan on a 5-year annualized basis:

| Fund in the Plan | Plan Fund Fees | Alternative Fund | Alternative Fees | Excessive Fees Per Year |
|---|---|---|---|---|
| Dodge & Cox Balanced | 0.53 | American Funds Balance R6 | 0.26% | 0.27 |
| Dodge & Cox International Stock | 0.63 | Fidelity International Index | 0.04% | 0.59 |
| Goldman Sachs Small Cap Value Instl | 0.99 | Vanguard Small Cap Index I | 0.04% | 0.95 |
| JHancock Disciplined Value Mid Cap I | 0.87 | Vanguard Mid Cap Index Institutional | 0.04% | 0.83 |
| American Funds Europacific Growth R5E | 0.62 | Vanguard Intl Div Apprec Idx Adm | 0.20% | 0.42 |

71.     Not only are the fees excessive as compared to the similar lower cost alternatives discussed above but the suggested alternative funds outperformed all of the funds significantly. The difference between the excessive fees paid for these underperforming funds and the suggested alternatives represent more lost savings each year for plan participants and have been compounded over the years.   The underperformance of these funds as compared to the suggested alternatives increases these damages exponentially. The underperformance of these funds is represented in the chart below on a 5-year performance annualized basis as of December 31, 2021:

| Fund in the Plan | Plan Fund Performance | Alternative Fund | Alternative Performance | Plan Fund Underperformance Per Year |
|---|---|---|---|---|
| Dodge & Cox Balanced | 10.57% | American Funds Balance R6 | 11.78% | -1.21% |
| Dodge & Cox International Stock | 7.19% | Fidelity International Index | 9.78% | -2.59% |
| Goldman Sachs Small Cap Value Instl | 8.99% | Vanguard Small Cap Index I | 13.50% | -4.51% |
| JHancock Disciplined Value Mid Cap I | 11.52% | Vanguard Mid Cap Index Institutional | 15.88% | -4.36% |
| American Funds Europacific Growth R5E | 12.71% | Vanguard Intl Div Apprec Idx Adm | 13.26% | -0.55% |

72.     As detailed in the chart above, the comparator funds in the chart easily outperformed the funds in the Plan over five years. A prudent fiduciary should have been aware of these better preforming lower cost alternative and switched to them at the beginning of the Class Period.  Failure to do so is a clear indication that the Plan lacked any prudent process whatsoever for monitoring the cost and performance of the funds in the Plan.

**E.     The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period**

73.     Another clear indication of Defendants' imprudent fee monitoring process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

74.     The term "recordkeeping" describes the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."

Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein.

75.     There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan): bundled services for a flat fee and a la carte services.

76.     Bundled services are essential services that are charged on a flat-fee (usually per participant) basis regardless of actual usage. Bundled services typically include, for example, recordkeeping, audits, accounting, consulting, compliance support, IRS compliance testing, transaction processing, and participant communications. The services a large plan chooses to use from the "bundle" do not affect the amount of money charged by recordkeepers.

77.     The other type of essential recordkeeping services, referred to as "a la carte," provided by all national recordkeepers, often has separate fees based on the usage of individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the costs created by the conduct of that individual. A la carte services typically include, among other things, loan processing, distributions, and brokerage window services (if offered).

78.     All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the North Memorial Plan.

79.     The cost of providing recordkeeping services often depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

80.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).

81.     Revenue sharing is the practice of adding additional non-investment related fees to the expense ratio of a mutual fund. These additional fees are then paid out to various service providers—usually unrelated to the fund company managing the fund.

82.     Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

83.     Mutual fund returns are reported net of fees, so the money collected from investors and paid out to other parties is not explicitly reported to investors, it simply reduces the net investment return of the fund. Because investors do not see the fees being deducted, the true cost of the fees charged is often overlooked when calculating the total cost of plan services.

84. Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited June 23, 2022).

85. In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

86. In the case of North Memorial's 401(k) plan, using a combination of a flat recordkeeping charge paid by participants with revenue sharing used to potentially cover additional fees resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

87. For example, in 2019 Plan participants paid $181 per year per person in recordkeeping and administrative fees: $91 per person per year in direct fees plus $90 per person per year in revenue sharing.

88. The administrative fees paid by North Memorial 401(k) Plan participants is more than three times the recent national median. *See* Lee Barney, DC Plan Fees

Remain Flat in NEPC Report, Plan Adviser (Aug. 25, 2017),

https://www.planadviser.com/dc-plan-fees-remain-flat-in-nepc-report/.

89.     Likewise, the administrative fees paid by North Memorial 401(k) Plan participants is more than three times the recordkeeping fees for similarly sized plans in the region. *See* NEPC, 2021 Defined Contribution Plan Trends and Fee Survey Results (Feb. 2022); NEPC, 2022 Defined Contribution Progress Report.

90.     To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

91.     Had the Plan's fiduciaries undertook their obligation to monitor the amount of recordkeeping fees, they would have discovered that the Plan was paying excessive fees and taken measures to reduce those fees for the benefit of the Plan and its participants.

## CLASS ACTION ALLEGATIONS

92.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following proposed class ("Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between six years before the filing of this lawsuit through the date of judgment (the "Class Period").

93.     The members of the Class are so numerous that joinder of all members is impractical. The 2020 Form 5500 for the 401(k) Plan lists 5,797 participants at the beginning of the plan year.

94.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

95.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

  A.   Whether Defendants are/were fiduciaries of the Plan;

  B.   Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

  C.   The proper form of equitable and injunctive relief; and

  D.   The proper measure of monetary relief.

96.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA and class action litigation. Plaintiffs have no interests antagonistic to those of other members of the

Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

97.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

98.     Additionally, or in the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## CLAIM FOR RELIEF

### Breaches of Fiduciary Duties of Loyalty and Prudence

99.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

100.     At all relevant times, North Memorial and/or the Board Defendants and its members during the Class Period were fiduciaries of the Plan within the meaning of

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

101.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

102.    Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants. Instead, Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan and to use those lower-cost share classes in the Plan.

103.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.

104.    Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

105.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties and must also restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

106.    Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**PRAYER FOR RELIEF**

Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

107.    A determination that this action may proceed as a class action under Rule 23(b)(1) and Rule 23(b)(2) of the Federal Rules of Civil Procedure;

108.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

109.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

110.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

111.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

112.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

113.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

114.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

115.     An award of pre-judgment interest;

116.    An award of costs pursuant to 29 U.S.C. § 1132(g);

117.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

118.    Such other and further relief as the Court deems equitable and just.


Dated: July 15, 2022.                    Baillon Thome Jozwiak & Wanta LLP

                                         s/ Shawn J. Wanta
                                         Shawn J. Wanta
                                         Bar No. 0389164
                                         Nicholas P. DeMaris
                                         Bar No. 0402896
                                         *Attorneys for Plaintiffs*
                                         BAILLON THOME JOZWIAK & WANTA LLP
                                         100 South Fifth Street, Suite 1200
                                         Minneapolis, MN 55402
                                         Telephone: (612) 252-3570
                                         sjwanta@baillonthome.com
                                         npdemaris@baillonthome.com